

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

| | |
|---|---|
| *970 Broad Street, 7th floor* | 973-645-2700 |
| *Newark, New Jersey 07102* | |

August 25, 2023

Hon. Michael A. Hammer, U.S.M.J.
United States District Court
MLK Building & U.S. Courthouse
50 Walnut Street
Newark, NJ 07101

    Re: <u>United States v. Christopher James Scanlon</u>
       Mag. No. 23-10168 (MAH)

Dear Judge Hammer:

  The Government respectfully submits this letter brief in opposition to Defendant Christopher Scanlon's ("Scanlon" or "Defendant") motion for bail modification. The Government submits that the current conditions of release are the least restrictive means, short of detention, to ensure Scanlon's continued presence in the United States during the pendency of the criminal case. For the reasons set forth below, the Government respectfully requests that the Court deny Scanlon's motion.

I. <u>Background</u>

  On April 20, 2023, Scanlon was charged in a one-count criminal complaint (the "Complaint") with conspiracy to engage in an unlicensed money transmitting business, contrary to 18 U.S.C. § 1960(a), in violation of 18 U.S.C. § 371.

  Scanlon, through his ownership of several companies including PMA Media Group, Inc. ("PMA"), AU Card, LLC, AU Card Ltd., and Nvayo Ltd. ("Nvayo") (collectively, the "AU Entities") provided customers a means to engage in anonymized financial services—a service that ultimately led to servicing individuals engaged in fraud and other criminal activities, several of which are outlined in the Complaint.[1]

---

[1] Law enforcement became aware of Scanlon after learning that individuals involved in the BitClub Network fraud scheme laundered hundreds of millions of dollars of suspected fraud proceeds through AU Entity accounts.

As alleged in the Complaint, as part of a purported "concierge service" called "Aurae Lifestyle," the AU Entities provided fiat and cryptocurrency financial services to its customers, which included (a) purchasing, trading, and liquidating cryptocurrency on behalf of their customers; and (b) transfers of fiat and cryptocurrency to third parties and among Aurae Lifestyle clients. According to records obtained from a cryptocurrency company utilized by the AU Entities, in or around 2018, AU Card, LLC engaged in over 160 digital asset trades that involved over $150 million. In or around 2019, AU Card, LLC engaged in over 5,900 digital asset trades that involved over $35 million. Despite blatantly engaging in money transmission within the United States, at no point were the AU Entities registered as Money Transmitting Businesses ("MTB") as that term is defined in Title 31, United States Code, Section 5330(d).

In addition to owning and controlling the AU Entities, Scanlon also acted as the primary "relationship manager" (i.e., a customer service representative) for several high-net-worth customers. As both the owner of the AU Entities and primary contact for these high-net worth Aurae Lifestyle customers, Scanlon had the authority to and did conduct transactions on behalf of customers with little to no oversight. Scanlon often communicated with customers about financial transactions using phone messaging applications, including through encrypted messaging applications that are not readily accessible to law enforcement (and often used by cybercriminals). If Scanlon were to be allowed to use internet connected devices without restriction, he would likely resume using these platforms to either further his criminal scheme and/or flee.

Records obtained during the Government's investigation evidence that Scanlon operated the AU Entities with little regard for the applicable U.S. financial regulatory system and viewed the penalties for regulatory noncompliance as insignificant. For example, in an exchange with another person working with the AU Entities, Scanlon acknowledged that the AU Entities were moving "fast," but Scanlon reasoned that moving fast is "how we win." Scanlon continued, "in the end, if the regulators come and scrutinize . . . they tell you what you have done wrong, slap you on the wrist with a fine, and you remediate."

In addition to the pending charges against Scanlon, the AU Entities are being investigated for failing to enact an appropriate money laundering compliance program in violation of the Bank Secrecy Act, money laundering on behalf of its customers, misrepresenting the nature of its business to banks and other third parties, and conspiracy to thwart U.S. regulators, including the Treasury Department and the IRS, from discovering the true nature of its business dealings.

On May 25, 2023, Scanlon was arrested at the Miami airport after traveling to the United States. On May 26, 2023, Scanlon appeared before United States Magistrate Judge Alicia M. Otazo-Reyes in the Southern District of Florida. At that

time, the Government moved for Scanlon to be detained. Scanlon was ultimately released on a $5,000,000 appearance bond with 20% secured, home confinement with GPS monitoring and other restrictions, including a prohibition from using connected devices or engaging in any activity related to the AU Entities.

On June 5, 2023, Scanlon had his initial appearance virtually before this Court. At that time, the Government moved for either detention or the imposition of the same conditions previously imposed by the Southern District of Florida on the basis that Scanlon presented an unreasonable flight risk based on his significant wealth, ability to oversee and operate his businesses remotely, and his significant ties to and assets in the United Kingdom.

Following a hearing, this Court granted Scanlon pretrial release with the following conditions, which were substantially the same as those previously imposed in the Southern District of Florida including:

- $5,000,000 appearance bond with 20% secured and one co-signor;

- The surrender of all passports and travel documents;

- No contact with victims, witnesses, or clients and employees of Scanlon's businesses unless in the presence of counsel;

- Home detention with electronic monitoring;

- No possession or use of computers, except for pre-approved Court purposes including contact with defense counsel;

- Travel restricted to the Middle District of Florida and District of New Jersey, unless otherwise approved by Pretrial Services;

- No employment in money transmitting businesses; and

- No engaging in financial transactions on behalf of, or through accounts associated with the money transmitting business, or conducting or directing others to engage in any financial transactions on behalf of the money transmitting business, including opening new accounts, except as permitted by the Court.

The Government is willing to consent to a minor modification to the above conditions of release to allow Scanlon to have communications with his family and defense counsel, which the Government understands can be appropriately monitored by Pretrial Services to ensure compliance. However, for the reasons set forth further

below, maintaining Scanlon's current conditions of release is imperative to ensuring his appearance at trial.

   II.   Bail Reform Act

The Bail Reform Act of 1984, highlights two criteria the Court is to consider when making determinations of release or detention: (1) risk of flight or (2) safety to the community. When making a determination regarding the eligibility of a defendant for pretrial release the Bail Reform Act directs the Court to consider: (1) the nature and circumstances of the offense charged, (2) the weight of the evidence, (3) the history and characteristics of the person(s), and (4) the nature and seriousness of the danger to any person or the community posed by the defendant's release. 18 U.S.C. § 3142(g).

   III.  There is a Tangible Risk of Flight that Supports the Current Bail Restrictions

        a. The Nature and Circumstances of the Offense and Weight of the Evidence Strongly Support the Current Bail Restrictions

Despite counsel's claims to the contrary, Scanlon has a strong incentive to flee—the very lucrative businesses that he has run for almost two decades are under investigation by U.S. authorities for potential violations of the Bank Secrecy Act, bank fraud, and money laundering, among other violations of Federal law, and he is currently charged with a serious felony. If Scanlon fled the jurisdiction, he could continue to run these businesses with impunity outside of U.S. regulation. The departure of Scanlon's family back to the United Kingdom only adds to this potential likelihood.

The risk of flight is only heightened by Scanlon's wealth and ties to the United Kingdom. Indeed, prior to his arrest in this case, Scanlon resided in the United Kingdom with his family in a residence that is estimated to be worth 9.3 million pounds. Records reviewed during the investigation revealed significant holdings in digital assets and numerous bank accounts in multiple jurisdictions under Scanlon's control.

While the Government acknowledges that Scanlon was required to be removed from bank accounts associated with the AU Entities as a condition of his release, should Scanlon flee the United States, he would no longer be precluded from doing so.

The potential for Scanlon to flee is not minimized by the forfeiture of his passport. Indeed, Scanlon's customer base includes very wealthy foreign-based individuals who could help him flee. In fact, such a service was part of the AU

Entities' offerings.  On at least one occasion, Scanlon successfully helped one of his customers flee a foreign country, without a passport, while that customer was facing charges in that country.  Chats between Scanlon and the individual, identified as Customer-5 in the Complaint, reflect that at one point, Customer-5 sought Scanlon's help to escape from Malaysia, where Customer-5 was facing charges.  Scanlon successfully arranged to have a jet pick up Customer-5 and bring him to the United States.  According to Customer-5, Scanlon checked with Interpol to see if there was a warrant lodged against Customer-5.  Customer-5's explanation is corroborated by chat messages exchanged between Scanlon and Customer-5.  During one exchange, Scanlon bragged to Customer-5 that "One of our members is the 2nd richest person in Malaysia."  Courts have found in cases involving large scale international criminal activity, "a defendant's alleged ties to a large [ ] syndicate indicate that he has strong connections to people who have the resources to, ability to, and interest in helping him flee the jurisdiction, [which] favors denying bail." *United States v. Boustani*, 356 F. Supp. 3d 246, 252 (E.D.N.Y. 2019) (denying bail for defendant charged with fraud and money laundering offenses) (internal quotations omitted and omission in original).

      b. Scanlon's Significant Exposure Weighs in Favor of Maintaining the Current Restrictions

Scanlon created a series of entities aimed to facilitate the movement of hundreds of millions of dollars on behalf of criminals.  As a result, Scanlon's sentencing exposure is far from "administrative," and renders him an unreasonable flight risk.  Indeed, Scanlon's advisory guideline range is well over the five-year statutory maximum sentence for the pending charge.[2]  As other courts have observed, "[w]hen faced with the possibility of a significant prison term, defendants have a strong incentive to flee."  *Boustani*, 356 F. Supp. 3d at 252; *see United States v. Khusanov*, 731 F. App'x 19, 21 (2d Cir. 2018) (summary order) ("a district court does not clearly err in concluding that a defendant facing a potentially lengthy prison sentence possesses a strong motive to flee")).

      c. Scanlon's Request to Allow for Unfettered Use of a Computer for "Work" is Vague and Misleading.

The Government has significant concerns that if permitted unfettered access to a computer for "work," Scanlon will either (a) continue to operate the AU Entities that are presently the target of pending investigations in the United States and abroad; or (b) engage in efforts to dissolve or sell the AU Entities or related assets that could be subject to forfeiture if Scanlon is convicted of the current charge or any future related charges.  Curiously absent from counsel's submission is the fact that,

---

[2] Scanlon's advisory Guideline range for the pending federal charge is between 151 to 188 months' imprisonment if convicted at trial.

despite the current restriction prohibiting business dealings involving the AU Entities, Scanlon has allegedly connected with a third-party about liquidating the AU Entities. Indeed, counsel's submission fails to mention the Government's objection to a prior request that Scanlon be permitted to engage in discussions with a former AU Entity client regarding the sale of the AU Entities without counsel involved.[3]

Moreover, the Government notes that it would be almost impossible for pretrial services to decipher whether Scanlon's computer and internet usage was fin reality or "work" in connection with his newly minted artificial intelligence company. Nor would pretrial services be able to determine or have any visibility into any bank accounts Scanlon would establish to facilitate this AI business and whether transactions in those accounts were, in reality, prohibited transactions related to the AU Entities.

The Government's concerns are only compounded by the nearly three-year period of obstruction that Scanlon and his related companies have engaged in in connection with the present case. During the pendency of its investigation, the AU Entities have (1) consistently delayed to properly produce records responsive to Grand Jury process; (2) provided information about U.S. employees' access to records that is inconsistent with the companies' prior productions and representations made to the Government by witnesses in the case; (3) potentially destroyed certain records likely responsive to the Grand Jury process; and (4) failed to respond with clarity to questions posed by the Government on numerous occasions. The Government simply has no basis to believe that Scanlon, who wielded sole authority to operate the AU Entities illegally for years will abstain from doing absent the current restrictions.

> d. The Departure of Scanlon's Wife to the United Kingdom is not a Change in Circumstance that Warrants Modification of his Conditions of Release.

The Government acknowledges that Scanlon's ability to rely on his wife to obtain groceries and household items will be impacted upon her departure. But a negligible inconvenience does not justify modification of the terms of Scanlon's

---

[3] Specifically, the Government is aware that a Letter of Intent was provided to one or more individuals related to sale of one or more of the AU Entities. The Government is not aware of whether Scanlon communicated the Letter of Intent regarding the disposition of the assets, but, presumably, if Scanlon made such communication, it required the use of a computer. The Government has not been apprised of the identity of the potential third party other than it was a former customer of the AU Entities. The Government has similarly not been offered any explanation as to why no other employee of the AU Entities or outside party could be retained to handle such negotiations on Scanlon's behalf, other than being advised generally that Scanlon is the only individual able to handle such negotiations.

pretrial release given the risk of flight. Indeed, the departure of his wife and children only increases the likelihood of flight.

Nevertheless, the Government is willing to consent to a modification of the conditions of Scanlon's release to provide for limited use of a connected device solely to communicate with his family, pretrial services, and to communicate with counsel in the pending criminal case. Pretrial Services has advised the Government that it is capable of monitoring such activity to ensure compliance, which alleviates much of the concerns raised by Scanlon regarding the ability to prepare a defense, speak with his family, and coordinate with Pretrial Services for necessary household errands.

        Respectfully submitted,

        PHILIP SELLINGER
        United States Attorney

        */s/ Sophie E. Reiter*
By:   Sophie E. Reiter
        Assistant U.S. Attorney

cc: Edward Kim, Esq., counsel to the Defendant Christopher J. Scanlon (via email)